**UNITED STATES of America, Plaintiff,**

v.

**Donald Lee LOUIS, Defendant.**

**No. M87–07–01 CR.**

United States District Court, W.D. Michigan, N.D.

Feb. 2, 1988.

Donald A. Davis, Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff.

Larry C. Willey, Grand Rapids, Mich., for defendant.

## OPINION

HILLMAN, Chief Judge.

Currently before the court is defendant Donald Lee Louis's motion to suppress evidence pertaining to his arrest and arraignment for alleged possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(1)(B), and 924(e)(1). Specifically, defendant moves for the suppression of a gun which defendant argues was illegally seized from him by the Escanaba police; statements that he made to the Escanaba police on June 5, 1987; statements that he made to federal agents on June 11, 1987; and the photographic and in-court identifications of defendant made by two of the witnesses in this case.

The court held an evidentiary hearing on these motions on November 2, 1987. For the reasons discussed below defendant's motion to suppress the gun obtained from him on June 5, 1987, is denied, as is his motion to suppress the statements given to the state agents on June 5, 1987, and the photographic and in-court identifications.

However, defendant's motion to suppress the statements given to the federal agents on June 11, 1987, is granted.

### I. *Finding of Fact*

On June 5, 1987, Detective Stasewich and Captain Beveridge of the Escanaba Public Safety Department, went to the Escanaba Yacht Harbor in response to a complaint by two high-school youths that a man on a boat named the Ruby III had pointed a gun at them. The officers found the boat. However, according to the officers' testimony, neither boarded it in part because they found a large dog tied to the plank leading from the dock to the deck. Instead the officers remained on the land adjoining the dock against which the boat was moored.

Detective Stasewich testified that he called to defendant requesting that he come out and speak with him and Captain Beveridge. Defendant walked down the plank, meeting the officers at the edge of the dock. Detective Stasewich informed him that he and Captain Beveridge were there to investigate a complaint. Defendant Louis apparently began to speak, but Stasewich interrupted him to read him his *Miranda* rights. According to the officers, defendant responded that he understood his rights. Defendant then gave his account of the incident involving the two youths. Detective Stasewich asked defendant Louis if he could "see" the gun. Louis called to Sara McPhetres, a friend of his who was also aboard the boat, to bring the gun to him. She retrieved the gun from below and handed it to Louis who handed it to Stasewich. Both officers testified that Detective Stasewich was unable to remove the clip from the gun to determine whether it was loaded. He consequently handed the gun back to Mr. Louis and asked him to make it "safe." Both officers testified that when Louis pulled back the bowl of the gun a bullet flipped into the lake. They also testified that defendant stated that the gun belonged to Ms. McPhetres. She, however, was unable to produce papers documenting its ownership. The officers took back the gun and told defendant that they

were going to determine to whom it was registered.

On July 9, 1987, a bench warrant was issued in Delta County Court for defendant's arrest. On June 10, 1987, defendant was arraigned in state court and charged with two state felonies, felonious assault and felony firearm. He was represented by counsel.

On June 11, two agents from the Bureau of Alcohol, Tobacco, and Firearms (ATF), George Stoll and Jack Welch, called defendant and asked him to meet them at the Escanaba Public Safety Department. Officer Stoll met defendant in the lobby of the Department, took him to a small unused room, advised him of his *Miranda* rights, and gave him a waiver form to sign. Defendant signed the form. During the conversation that ensued, defendant in large part repeated what he had told the state police officers. The ATF officers placed defendant under arrest. On June 12, 1987, he was arraigned before United States Magistrate Stephen W. Karr and charged with violating 18 U.S.C. §§ 922(g)(1), 924(a)(1)(B), and 924(e)(1).

According to Agent Stoll's report of June 22, 1987, ATF first became involved in the Louis investigation on June 9, 1987, at the request of Thomas Smithson, the Delta County Prosecutor. The Stoll report states that Smithson said that on June 5, 1987, defendant was alleged to have been in possession of a handgun while aboard his boat. Smithson further informed Agent Stoll that Louis was suspected of having three prior felony convictions. Smithson stated that he wanted ATF assistance with the case. Finally, Stoll's report states that Smithson told Stoll that in connection with the June 5 incident, the state had charged Louis with felonious assault, felony firearm, and habitual criminal, but that the state would defer these charges for federal prosecution.

Before Agent Stoll spoke with defendant, he ran a computer criminal history check on Mr. Louis, and confirmed by telephone that he had been convicted of felonies in three separate Michigan circuit courts. On June 10, 1987, Agent Stoll searched the records of the Delta County Circuit Court, received papers regarding the ownership of the Ruby III from Prosecutor Smithson, interviewed one of the complaining witnesses, and examined the gun at issue in this case.

On June 11, Agent Stoll met with Detective Stasewich and Captain Beveridge to discuss their interview with defendant Louis. Stoll also checked ATF and Coast Guard records and determined that Louis had been the subject of an ATF search warrant in 1978 and that the Coast Guard had boarded the Ruby III on June 8, 1987. Finally, late in the afternoon, Agents Stoll and Welch interviewed Louis as described above.

Some six weeks after defendant's arraignment on federal charges, Agent Stoll and Captain Beveridge conducted photo identifications during which the two complaining witnesses independently selected defendant's photo out of a group of five color Polaroid snapshots. The witnesses also identified defendant in court during the November 2, 1987, hearing.

## II. *Suppression of the Gun*

■ The government has the burden of proving, by a preponderance of the evidence, that consent to examine and take the gun was freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact to be determined from the totality of circumstances. *Id.* at 223, 93 S.Ct. at 2045. According to the Sixth Circuit, consent must be proved by "clear and positive testimony." *United States v. McCaleb,* 552 F.2d 717, 721 (1977). The government must show that the consent was "unequivocal, specific and intelligently given" and "uncontaminated by any duress or coercion." *Id.* However, it need not establish a "constitutional 'waiver,' that is, 'an intentional relinquishment or abandonment of a known right or privilege.'" *United States v. Hearn,* 496 F.2d 236, 243 (6th Cir.1974) (quoting *Schneckloth v. Bustamonte; supra*).

Courts have looked to a variety of facts in assessing consent including: whether

the defendant was a youth; whether defendant was uneducated or, conversely, well versed in the law; whether the information on which the investigation was based was unlawfully obtained; whether defendant was given his *Miranda* rights; the length of the detention and the length and nature of the questioning; the use of physical threats; the familiarity of the surroundings; defendant's freedom of movement during the questioning or search; defendant's cooperation or lack of cooperation in the search; the number of officers present during the interview and search; whether the officers told defendant that he did not have consent to the search; and whether the officers suggested that defendant give them the thing seized. *See Schneckloth v. Bustamonte, supra,* 412 U.S. at 226, 93 S.Ct. at 2047; *United States v. Hearn, supra,* 496 F.2d at 243.

▮ Assessing the testimony of Detective Stasewich and Captain Beveridge in light of these factors, I am satisfied that the government has proved by a preponderance of the evidence that defendant freely consented to the examination and taking of the gun. First, defendant is neither a youth nor completely unfamiliar with the law. He is a middle aged man who has not only been charged and convicted of felonies on three separate occasions, but has also served as a ATF informant. Second, the information prompting the investigation of the Ruby III by the Escanaba police force was not obtained illegally. Third, prior to questioning defendant about the incident Detective Stasewich read defendant his *Miranda* rights. While this alone does not establish consent, seen in light of the relatively short duration of the questioning, the fact that the discussion took place in surroundings familiar to defendant, that the officers did not board defendant's boat, and that there was no physical coercion threatened, it does weigh heavily in favor of a finding that when defendant said he understood his rights and subsequently brought the officers the gun and gave it to them, he did so freely and not as a result of improper duress or coercion. Finally, the fact that defendant had known both officers for much of his life lends further weight to a

finding that he was not intimidated into turning over the gun.

The only factors weighing in favor of a finding that defendant's consent was not freely given are that defendant did not initiate the examination himself but only brought out the gun at the suggestion of Detective Stasewich and the failure of the officers to tell defendant that he was not obligated to let them see or carry away the gun. However, given defendant's experience with the law and the fact that he was read and said he understood his *Miranda* rights, I am satisfied that defendant knew that he neither had to talk to nor cooperate with the officers and that his presentment of the gun for inspection was not coerced. Accordingly, defendant's motion with respect to the gun is denied

### III. *Suppression of the Statements of June 5, 1987*

▮ If a defendant held in custody or its functional equivalent is subject to interrogation by the police, statements made by that defendant cannot be used against him unless the government proves by a preponderance of the evidence that he voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 856–57, 93 L.Ed.2d 954 (1987); *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). In this case, the government argues that it need not prove that defendant freely and intelligently waived his *Miranda* rights as defendant was not held in custody or interrogated. I tend to agree with the government. However, even assuming that the circumstances under which defendant was questioned amounted to custodial interrogation, I conclude, on the basis of the testimony of Detective Stasewich and Captain Beveridge, that the officers gave defendant his *Miranda* rights before questioning him. Furthermore, given defendant's past experience with the law, I am satisfied that he understood the full import of the rights he gave up when he waived them and gave a statement to the officers. Defendant's motion for suppres-

sion of his June 5, 1987 statements is denied.

## IV. *Suppression of the Statements of June 11, 1987*

■ Whether defendant Louis's statements of June 11, 1987, to the federal agents should be suppressed is a somewhat more difficult legal question. Under *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), if a defendant asserts his right to counsel at arraignment, and the police subsequently initiate questioning regarding those offenses, any waiver of defendant's right to counsel for that interrogation is invalid. *Id.* 106 S.Ct. at 1411. The fact that the police may not have known that defendant had been arraigned and asserted his or her right to counsel is irrelevant. *Id.* at 1410.

■ The government argues that *Jackson* is inapplicable to this case as the post-arraignment questioning of defendant by the federal agents was directed at a federal charge not the state charge pursuant to which he had asserted his Sixth Amendment right to counsel. I disagree.

There are no cases addressing the situation where the pending charge is a state offense and the offense being investigated at the time of the post-arraignment questioning is federal. However, the rationale of *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), as well as a number of circuit court opinions, suggests that the key to analyzing whether a second charge is so related to the first that the Sixth Amendment protection invoked pursuant to the first extends to the second, is not whether the charges are brought by the same sovereign. But rather, whether the allegedly criminal behavior which was the subject of the post-arraignment investigation is different than the allegedly criminal behavior on which the first charge is based. Only when the post-indictment statements involve acts different than those on which the pending indictment rests and on which new and different criminal charges may be based, may the statement be used. Thus, statements regarding acts other than those on which the pending

offense is based, are admissible. *See United States v. Grego*, 724 F.2d 701, 703 (8th Cir.1984); *United States v. Badolato*, 710 F.2d 1509, 1513 (11th Cir.1983); *United States v. Calhoun*, 669 F.2d 923 (4th Cir. 1982); *Grieco v. Meachum*, 533 F.2d 713, 717–18 (1st Cir.1976). Logic therefore suggests that statements regarding the acts which are the acts on which the pending offense is based, cannot be used to support new charges if they were obtained outside the presence of defendant's counsel.

Here, the acts described in the statement defendant seeks to suppress are not simply related to the acts on which the pending state charges were based. They are, in fact, the same acts on which the state charges were based. It even appears that the state prosecutor as well as ATF Agent Stoll viewed a suit by the federal sovereign to be interchangeable with a suit by the state sovereign. Agent Stoll and Agent Welch undertook the case at the request of the state prosecutor. They knew before questioning defendant that he had been arraigned on state charges and they understood that the state charges would be dropped if federal charges were initiated. Clearly, this is different from the situation in *United States v. Skipworth*, 697 F.2d 281, 284 (10th Cir.1983). There the Tenth Circuit held that there was no authority for the proposition that when the right to counsel attaches in a state prosecution, it carries over to a subsequent federal investigation made after the dismissal, on defendant's motion, of the state charges. Finally, under oath, Agent Stoll testified that the federal investigation repeated the state investigation and that both the federal and state cases were based on the same acts by defendant.

The acts referred to in the June 11, 1987, statements are not in any way different from the acts referred to in the June 5, 1987, statement. Therefore they are not exempt from defendant's June 10, 1987, invocation of his Sixth Amendment right to counsel. Accordingly, defendant's motion to suppress the statements of June 11, 1987, is granted.

## V. Suppression of the Photo Identifications and Subsequent In–Court Identifications

With respect to the photo identifications, defendant seeks suppression arguing that the displays were improperly suggestive. He also seeks suppression of the witnesses' November 2, 1987, in-court identifications as well as any subsequent identifications by witnesses on the grounds that they are tainted by the allegedly improper photo line-up.

■ When a conviction based on identification testimony following a pretrial identification is challenged, the Sixth Circuit prescribes a two-step analysis to determine whether the Constitution has been violated. First, the court must determine if the pretrial out-of-court identification procedure was unduly suggestive. If it was, then the court must determine from the totality of the circumstances whether the in-court identification is nevertheless sufficiently reliable to avoid a substantial likelihood of irreparable identification. *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986).

■ Defendant's only argument supporting his claim that the photo identifications here were unduly suggestive is that they took place six weeks after defendant had been arrested and charged. Defendant argues that there was no reason why a more reliable corporeal line-up was not used. Such a line-up, defendant continues, would have required the presence of counsel who could have ensured that the identification procedure was proper. I tend to agree with defendant that such a line-up would have been the better procedure. Indeed, under Michigan law, a photo identification in the absence of counsel after defendant has been charged is per se illegal. *See People v. Anderson,* 389 Mich. 155, 205 N.W.2d 461 (1973). Nevertheless, that is not the law in the federal system. *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

■ In any case, looking to the photos and the testimony describing the procedures used to present the photos, I am satisfied that the pretrial identification was not unduly suggestive. At the hearing, one of the complaining witnesses described the person who threatened him as a white male, with dark hair and a mustache, approximately 5'10" tall. The report of the witnesses' statements taken on June 5, 1987, which was referred to by Detective Stasewich during his testimony, apparently states that the two witnesses described the suspect as "kind of tall, skinny, dark hair and mustache."

Agent Stoll testified that in putting the photo display together he attempted to find color Polaroid pictures that fit the description of defendant provided by the complaining witnesses. The picture of Mr. Louis used at the identifications was a color Polaroid as were the other four pictures shown to the witnesses. All of the photos depicted white males. Four had unmistakably brown hair. One had hair that was dark on the top and bottom and light on the sides. All had facial hair. Three had mustaches. A fourth had a full beard and mustache, and a fifth had a mustache and some hair on the chin area. Mr. Louis and one other individual are shown to be approximately 5'5". Another appeared to be 5'8", a fourth 6', and a fifth 6'2". I am satisfied that Mr. Louis's picture did not stand out from the rest.

It should also be noted that all of the pictures are identified by name and date at the bottom. However, Agent Stoll, as well as the agent who assisted him with the photo identification, Detective Stasewich, testified that the names and dates were covered over with notebook paper. Although the witnesses did not remember that notebook paper or tape covered the names and dates, they credibly testified that they do not remember any names and dates on the pictures.

Finally, the two witnesses were not together when they were shown the photo displays. Thus, there can be no possibility that one witness identified defendant simply because the other witness did so.

Defendant motion to suppress the photo identification and subsequent in-court identification is denied.

### VI. *Conclusion*

In conclusion, defendant's motion to suppress the gun obtained from him on June 5, 1987, is denied, as is his motion to suppress the statements given to the state agents on June 5, 1987, and the photographic and in-court identifications. Defendant's motion to suppress the statements given to the federal agents on June 11, 1987 is granted.